ACCEPTED
03-14-00660-CV
4513311
THIRD COURT OF APPEALS
AUSTIN, TEXAS
3/16/2015 2:30:04 PM
JEFFREY D. KYLE
CLERK

**Cause No. 03-14-00660-CV**

---

**IN THE COURT OF APPEALS FOR THE THIRD JUDICIAL REGION OF TEXAS**

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/16/2015 2:30:04 PM
JEFFREY D. KYLE
Clerk

---

**Craig Zgabay and Tammy Zgabay**

**v.**

**NBRC Property Owners Association**

---

**AMICUS BRIEF OF THE TEXAS CHAPTERS OF COMMUNITY ASSOCIATIONS INSTITUTE**

---

Darryl W. Pruett
Texas State Bar No. 00784795
darryl@weichertlaw.com

George V. Basham, III
Texas State Bar No. 01868000
george@weichertlaw.com

Glenn K. Weichert
State Bar No. 21076500
glenn@weichertlaw.com

The Weichert Law Firm
3821 Juniper Trace, Suite 106
Austin, Texas 78738
(512) 263-2666
(512) 263-2698 - Facsimile
**ATTORNEYS FOR AMICI CURIAE**

# Table of Contents

Table of Contents ....................................................................................... ii

Index of Authorities ................................................................................. iii

Identity and Interest of Amicus Curiae ....................................................... v

Issues Presented ...................................................................................... vii

Summary of the Argument ......................................................................... 1

Argument ................................................................................................. 5

    I.   Short-Term Rentals Are Not A Residential Use ............................ 5

       A. The Proper Interpretation of Restrictive Covenants .................... 5

       B. Transient Rentals Are A Commercial Enterprise ........................ 7

       C. The Hotel Occupancy Tax Questionnaire .................................. 18

    II. The Deleterious Effects Of Transient Rentals ................................ 19

    III. Conclusion and Prayer .............................................................. 21

# Index of Authorities

**Cases**

*Allstate Ins. Co. v. Sylvester,* No. 07-00360, 2008 U.S.Dist. LEXIS 42386, at \*\*16-20 (Dist. Hawaii May 21, 2008)…………………………………………… 17

*Benard v. Humble*,
990 S.W.2d 929, 931 (Tex.App.—Beaumont 1999, pet. denied). ......... 2, 7, 8, 13

*Cowling v. Colligan*,
312 S.W.2d 943 (Tex. 1958) ......................................................................7

*Environmental Processing Sys., L.C. v. FPL Farming Ltd.*,
No. 12-0905, 2015 Tex. LEXIS 113, at \*9 (Tex. Feb. 6, 2015)..........................10

*Four Seahorses, LLC v. Spanish Grant Civic Ass'n, Sections 1 & 2, Inc.,*
Nos. 14-04-00638-CV, 14-04-00982-CV, 2005 Tex. App. LEXIS 9081 (Tex. App.—Houston [14th Dist.] Nov. 3, 2005, pet. denied). ......................................8

*Friendswood Dev. Co. v. Smith-Sw. Indus., Inc.*,
576 S.W.2d 21, 29 (Tex. 1978). ........................................................10

*Grain Dealers Mut. Ins. Co. v. McKee*,
943 S.W.2d 455 (Tex. 1997) ..............................................................5

*Hagemann v. Worth*,
782 P.2d 1072 (Wash. Ct. App. 1989)...............................................7

*Hyatt v. Court*,
No. 2008-CA-01474-MR, 2009 Ky. App. Unpub. LEXIS 738, at \*10-\*11 (Ky. Ct. App. Aug. 28, 2009).................................................................17

*Mills v. Bartlett,*
377 S.W.2d 636 (Tex. 1964) ........................................................8, 13

*Munson v. Milton,*
948 S.W.2d 813 (Tex. App.—San Antonio 1997, pet. denied)..........................6

*Owens v. Ousey*,
241 S.W.3d 124, 129 (Tex. App.—Austin 2007, pet. denied) ...........................5

*Pilarcik v. Emmons*,
966 S.W.2d 474 (Tex. 1998) ..............................................................5

*Quinn v. Harris,*
No. 03-98-00117-CV, 1999 Tex.App. LEXIS 1576, at fn. 3 (Tex. App.—Austin March 11, 1999, pet. denied) (not designated for publication) ...........................6

*Reagan National Advertising of Austin, Inc. v. Capital Outdoors, Inc.*,
96 S.W.3d 490, 493 fn. 2 (Tex. App.—Austin 2002, vacated w/o ref. to merits and remanded for settlement) ...............................................................................6

*Southampton Civic Club v. Couch,*
322 S.W.2d 516 (Tex. 1959) ................................................... 8, 9, 12

*Southampton Civic Club v. Foxworth*,
550 S.W.2d 152 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ denied n.r.e.) .9

*Southland Royalty Co. v. Humble Oil & Ref. Co.*,
249 S.W.2d 914, 916 (Tex. 1952) ...................................................10

*Vonderhaar v. Lakeside Place Homeowners Assoc., Inc.*,
No. 2012-CA-002193-MR, 2014 Ky. App. Unpub. LEXIS 637, at *11 (Ky. Ct. App. Aug. 8, 2014) ...............................................................................13

*Wasson Interests, Ltd. v. City of Jacksonville*,
No. 12-13-00262-CV, 2014 Tex. App. LEXIS 7377 (Tex. App.—Tyler July 9, 2014, pet. filed) (mem. op.) ...............................................................18

*Wein v. Jenkins*,
No. 03-04-00568-CV, 2005 Tex.App. LEXIS 7477 (Tex. App.—Austin Sept. 9, 2005, no pet.) (mem. op.).............................. 1, 7, 10, 11, 12, 14, 15, 16

### Statutes

TEX. PROP. CODE § 202.002...............................................................................1, 5
TEX. PROP. CODE § 202.004 ................................................................................6
TEX. TAX CODE § 156.001 .............................................................................3, 15
TEX. TAX CODE § 156.101 .............................................................................3, 15

### Other Authorities

ATTORNEY GENERAL OPINION NO. WW-182 (1960)…..………………………3, 16, 17
MERRIAM-WEBSTER ONLINE DICTIONARY .................................................................8

iv

## IDENTITY AND INTEREST OF AMICUS CURIAE

This brief is filed on behalf of the Texas chapters of the Community Associations Institute ("CAI"), which is an international organization. CAI has four chapters in Texas—Austin, Dallas/Fort Worth, Greater Houston and San Antonio. The cost for preparation of this brief is being borne solely by these chapters. There are more than 5 million people living in the 25,000-30,000 community associations in the State of Texas.[1] CAI serves its members by providing information and education, connecting communities with service providers, and advocating on behalf of those neighborhoods. CAI helps communities to protect their property values, preserve the character of the communities, and meet the expectations of their residents. CAI submits this brief to address the following central issue: Whether an owner's transient rental of his or her residence violates the community's single-family residential use restrictions.

One of the most important benefits offered to residents by their community association is the preservation of the characteristics and qualities of the community. And the most important attribute for the vast majority of communities is their residential character. Like zoning laws, the restrictive covenants for many communities contain provisions which attempt to restrict the use of property for purposes that are believed to be incompatible with the character of the community.

---

[1] http://www.txcaa.org/facts-about-poas

Having an owner utilize his or her property for commercial purposes can be extremely detrimental to the community. Commercial uses can attract customers and clients to the community, increase traffic and parking on the community's roads, and create other nuisance issues such as noise and odors. All these issues can detract from the residential nature of a community.

Transient rentals can present their own set of additional issues for the community. Non-resident owners sometimes fail to exercise the same level of care and concern for their properties as that of resident owners. Transient renters have little incentive to care for the property or behave neighborly toward homeowners and resident families. An inattentive owner may lease the property without discretion, attracting criminals and other unsavory characters to the community, and potentially endangering the health, safety and welfare of residents.

Without the ability to regulate commercial activity within a community, community associations are wholly unable to protect the residential character of the community, which is deleterious to property values. The outcome of this case critically impacts the interests of the above-described CAI constituents.

# ISSUES PRESENTED

**I.**      **Transient Rentals Are Not A Residential Use**

     *A.*      *The Proper Interpretation Of Restrictive Covenants*

     *B.*      *Transient Rentals Are A Commercial Enterprise*

     *C.*      *The Hotel Occupancy Tax Questionnaire*

**II.**      **The Deleterious Effects On Neighborhoods Of Short-Term Rentals**

**III.**      **Conclusion and Prayer**

## SUMMARY OF THE ARGUMENT

Restrictive covenants are unambiguous if they can be given a definite or certain legal meaning. They are only ambiguous if they are susceptible to more than one reasonable interpretation. The primary concern for a court in interpreting restrictive covenants is to ascertain and then give effect to the intention of the parties as expressed in the instrument. By statute, a restrictive covenant must be liberally construed to give effect to its purposes and intent. TEX. PROP. CODE § 202.002. Given that neither party here contends that the Restrictions are ambiguous, the Court need not strictly construe the Restrictions.

Transient rentals are a non-residential use of property. Property that is restricted to single-family residential purposes cannot be used for transient rentals because: (a) such rentals are a commercial use of the property; and (b) the transients do not have any intent to remain, and thus their use of the property is not residential. Business is the antonym or opposite of residential. Engaging in transient rentals and otherwise operating restricted property as a business in the nature of a hotel is a prohibited business or commercial use. *Wein v. Jenkins*, No. 03-04-00568-CV, 2005 Tex. App. LEXIS 7477 (Tex. App.—Austin Sept. 9, 2005, no pet.) (mem. op.) Using restricted property for weekend rentals is "more aptly described as temporary, or for retreat purposes, or transient housing, rather than for

1

residential purposes." *Benard v. Humble*, 990 S.W.2d 929, 931 (Tex. App.—Beaumont 1999, pet. denied).

The single-family residential-purposes restriction here restricts the use of the house, not merely the consanguinity of the renters. The argument that any use of the house by a single family is *per se* residential is groundless, as that would mean any rental of a hotel room for any length of time, even by the hour, would also be residential.

Appellants' proposed interpretation should be rejected for numerous reasons. This Court has never adopted such a strained reading of a single-family residential restriction. This Court has actually held one individual in contempt for violating a permanent injunction prohibiting him from operating his transient rental business when he rented the entire house for a family reunion weekend (and therefore presumably to a single family). Appellants' interpretation would allow rentals with no durational constraints, in direct contradiction to Texas law interpreting a "residential" use to require physical presence and an intent to remain, which a transient tenant does not have. Appellants do not offer any principled reason why their presence or absence from the house while it is rented for transient purposes makes any difference. The consanguinity of the renters and whether the owner is present may affect whether the rental violates the "single family" restriction, but they have no relevance to determining whether the rental is a residential use. The

relevant nature of a hotel is not that it might limit rentals to unrelated individuals or that the owner or manager is off-site. The relevant nature of a hotel is that it is a place for transient stays.

As a matter of state law, a transient rental of a house means that such house is a "hotel" for purposes of collecting the hotel occupancy tax. *See* TEX. TAX CODE § 156.001 ("In this chapter, 'hotel' means a building in which members of the public obtain sleeping accommodations for consideration. The term includes a hotel, motel, tourist home, tourist house, tourist court, lodging house, inn, rooming house, or bed and breakfast . . ."). The hotel occupancy tax is imposed on transient renters, and is not imposed on renters who rent for at least a 30 day term. *See* TEX. TAX CODE § 156.101 (tax is not imposed on "a person who has the right to use or possess a room in a hotel for at least 30 consecutive days . . ."). These Tax Code provisions evidence Texas public policy regarding transient rentals—such rentals are "in the nature of a hotel," regardless of the consanguinity of the renters.

Moreover, the Texas Attorney General has recognized that transient rental of property "is an enterprise that is commercial in nature." Tex. Att'y Gen. Op. No. WW-821 (1960), at fn. 1. Therefore, when the Restrictions were adopted, the declarant could not have intended "single family residential purposes" to include transient rentals of residential property because transient rentals of less than 30

3

days (the rentals subject to the hotel occupancy tax) were considered to be "an enterprise that is commercial in nature."

The Hotel Occupancy Tax Questionnaire makes clear that transient rentals are a business in the nature of a hotel.

Transient rentals have a deleterious effect on neighborhoods. The problems relate to the transient nature of the occupancy, not to the lack of consanguinity of the renters. One way of keeping these commercial businesses from infiltrating single-family residential zones is simply to enforce the restrictive covenants as written, and find—consistent with Texas law—that transient rentals are a commercial, or at least non-residential, use.

Many municipal governments have chosen to regulate these transient-rental businesses. The City of Austin, for example, limits the density of non-owner occupied transient rentals so as to preserve the residential character of its neighborhoods.

Transient rentals operate in a defined marketplace for their commercial services and many times operate outside the rules. Moreover, they undermine neighborhoods.

4

# ARGUMENT

## I.    Short-Term Rentals Are Not A Residential Use

### A.    The Proper Interpretation Of Restrictive Covenants

The Declaration of Covenants, Conditions and Restrictions River Chase Unit Three ("Restrictions"), in the Section entitled "Use Restrictions," restricts the Zgabays' use of their property to "single family residential purposes."  Clerk's Record ("CR") 70.  Restrictive covenants are interpreted in accordance with general rules of contract construction.  *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998).  Like a contract, covenants are "unambiguous as a matter of law if [they] can be given a definite or certain legal meaning."  *Id.* (citing *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997)).  Covenants are ambiguous only if they are susceptible to more than one reasonable interpretation.  *Id.*  The primary concern "is to ascertain and give effect to the true intention of the parties as expressed in the instrument."  *Owens v. Ousey*, 241 S.W.3d 124, 129 (Tex. App.—Austin 2007, pet. denied).  By statute, a restrictive covenant must be liberally construed to give effect to its purposes and intent. TEX. PROP. CODE § 202.002.  Moreover, an exercise of discretionary authority by a property owners' association concerning a restrictive covenant is presumed reasonable unless the court determines by a preponderance of the evidence that the exercise of

5

discretionary authority was arbitrary, capricious, or discriminatory. TEX. PROP. CODE § 202.004.

Restrictive covenants should therefore be liberally construed to determine the framers' intent, and only if there is any ambiguity as to that intent should the covenant be strictly construed. *See Munson v. Milton*, 948 S.W.2d 813, 816 (Tex. App.—San Antonio 1997, pet. denied). This is the standard used by this Court in interpreting restrictive covenants. *Quinn v. Harris*, No. 03-98-00117-CV, 1999 Tex. App. LEXIS 1576, at fn. 3 (Tex. App.—Austin March 11, 1999, pet. denied) (not designated for publication) ("The Fourth Court of Appeals [in *Munson*] has employed both [section 202.003(a)'s liberal and the common law's strict] standards to review a restrictive covenant, finding that the covenant should be liberally construed to determine the framers' intent, and if there is any ambiguity as to that intent, the covenant should then be strictly construed in favor of the free and unrestricted use of the premises. We believe the Fourth Court of Appeals has found the proper balance between the two standards that does not conflict with precedent or the Texas Property Code.").[2]

---

[2] While this Court subsequently held that the statute "does not conflict with the longstanding common-law rule that if there is ambiguity or doubt as to the drafter's intent, a covenant is to be strictly construed against the party seeking to enforce it and in favor of the free and unrestricted use of land", *See Reagan National Advertising of Austin, Inc. v. Capital Outdoors, Inc.*, 96 S.W.3d 490, 493 fn. 2 (Tex. App.—Austin 2002, vacated w/o ref. to merits and remanded for settlement), it cited *Munson* for that proposition. Therefore, the currently applicable rule appears to be the same as that articulated by the *Munson* court and by the Third Court of Appeals in the *Quinn* case. That is, restrictive covenants are to be strictly construed *if* there is any ambiguity, but in determining whether there is any ambiguity in the first instance the restrictive covenants are to be liberally construed to give effect to their purposes and intent.

Significantly, neither party here contends that the Restrictions are ambiguous. This Court should affirm the granting of the injunction against the Zgabays because their short-term rentals are not a single family residential purpose.

## B.    Transient Rentals Are A Commercial Enterprise

A residential-use restriction prohibits business or commercial use on the restricted property. *Cowling v. Colligan*, 312 S.W.2d 943 (Tex. 1958) (rendering judgment that covenant restricting use to residence purposes prohibited use of the tract for business and commercial purposes). "The term business is the antonym of residential and to provide residence to paying customers is not synonymous with a residential purpose." *Hagemann v. Worth*, 782 P.2d 1072, 1075 (Wash. Ct. App. 1989) (affirming injunction against use of residentially restricted property as an elder care home). This Court has similarly recognized that engaging in transient rentals and otherwise operating restricted property as a business in the nature of a hotel is a prohibited business or commercial use. *Wein v. Jenkins*, No. 03-04-00568-CV, 2005 Tex.App. LEXIS 7477 (Tex. App.—Austin Sept. 9, 2005, no pet.) (mem. op.). Moreover, weekend rentals are "more aptly described as temporary, or for retreat purposes, or transient housing, rather than for residential purposes." *Benard*, 990 S.W.2d at 931-32. Transients never establish a residence

because they do not have any intent to remain.  *Id*. at 932 (quoting from and citing *Mills v. Bartlett,* 377 S.W.2d 636, 637 (Tex. 1964)).[3]

"Commercial" means "of or relating to commerce."  MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/commercial (last visited March 13, 2015).  "Commerce" means simply "activities that relate to the buying and selling of goods and services."  MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/commerce (last visited March 13, 2015).

In accord with this understanding of the prohibition on commercial uses, the Texas Supreme Court held more than fifty years ago that residentially-restricted property could not be used primarily for financial gain.  In *Southampton Civic Club v. Couch,* 322 S.W.2d 516 (Tex. 1959), the Texas Supreme Court held that if an owner of residentially restricted property is: (a) operating a rooming or boarding house on his premises as a business; or (b) is using an establishment on his premises, separate and apart from his dwelling house, for renting as a source of financial gain; or (c) is renting space to others in his dwelling house as a separate housekeeping unit; or (d) is using his dwelling house primarily as a source of financial gain rather than as a residence for himself and his family and domestic

---

[3] In a subsequent case, the County Court at Law No. 3. Galveston County, Texas, enjoined transient rentals because the property was restricted to single family residential purposes. *Four Seahorses, LLC v. Spanish Grant Civic Ass'n, Sections 1 & 2, Inc.,* Nos. 14-04-00638-CV, 14-04-00982-CV, 2005 Tex. App. LEXIS 9081 (Tex. App.—Houston [14th Dist.] Nov. 3, 2005, pet. denied).

servants, that activity should be enjoined. *Couch*, 322 S.W.2d at 520.[4] Significantly, the Texas Supreme Court did not declare that any of these uses were more violative of the restriction than any other. They were simply equivalent commercial uses of the property that were prohibited by a single-family residential use restriction.

The "financial gain" referenced by the Texas Supreme Court need not be through any formal business entity, nor need it be significant to qualify such use as a prohibited commercial use. In *Southampton Civic Club v. Foxworth*, 550 S.W.2d 152 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ denied n.r.e.), the court enjoined the rental of residentially-restricted property. It rebuffed the defendants' argument that they were not making any profit on the rentals, holding that "[t]he fact that the Foxworths used each month's rental for residential maintenance does not alter the fact that this income was a source of financial gain." *Foxworth*, 550 S.W.2d at 153. The Zgabays do not reside at the property and are using the property primarily for financial gain. This is and has been a prohibited non-residential or commercial use under Texas law for more than half a century.

It is important to apply these decisions to the transient rentals at issue. According to the Texas Supreme Court, it "adhere[s] to prior decisions that have established rules relating to property rights unless, or until, the Legislature

---

[4] The Court did find that uses that were merely incidental to the owner's use of the property as a residence for the owner and his family were allowed. *Couch*, 322 S.W.2d at 520.

modifies those rules." *Environmental Processing Sys., L.C. v. FPL Farming Ltd.*, No. 12-0905, 2015 Tex. LEXIS 113, at *9 (Tex. Feb. 6, 2015). This is because the "doctrine of stare decisis has been and should be strictly followed by [the Texas Supreme Court] in cases involving established rules of property rights." *Friendswood Dev. Co. v. Smith-Sw. Indus., Inc.*, 576 S.W.2d 21, 29 (Tex. 1978). This is so, "even though good reasons might be given for a different holding." *Southland Royalty Co. v. Humble Oil & Ref. Co.*, 249 S.W.2d 914, 916 (Tex. 1952) (citations omitted). Thus, the fact that someone has created a new income stream from selling a particular service (whole-house rentals for transient stays) does not mean that the single-family residential purposes restriction does not apply to that new operation.

Moreover, the restriction is clear and unambiguous. In *Wein*, this Court affirmed a Travis County district court's entry of a permanent injunction prohibiting operation of a bed and breakfast on a lot that was restricted to "single-family, private residential purposes." *Wein*, 2005 Tex.App. LEXIS 7477, at *1-*2. The court affirmed the trial court's determination that use of the property for a "bed & breakfast," for a "commercial business in the nature of a hotel," or for a "venue for parties, business meetings, or retreats" was a business use, and therefore violated the provision restricting use of the property to "single-family, private residential purposes." *Wein*, 2005 Tex.App. LEXIS 7477, at *7-*8. The court

10

stated that the trial court's determination was "consistent with both the plain language and the underlying purpose of the Lot Use Restriction as it existed at the time the injunction was issued." *Wein*, 2005 Tex.App. LEXIS 7477, at *7-*8. In other words, the term "single-family, private residential purposes" was unambiguous and prohibited using the property for a "bed & breakfast," for a "commercial business in the nature of a hotel," or for a "venue for parties, business meetings, or retreats."

There is no significant difference between the restrictive language in the *Wein* case and the present one ("single-family, private residential purposes" versus "single family residential purposes"). Here, the restriction to "single family residential purposes" prohibits commercial or business uses, including, but not limited to, using the property as a "bed & breakfast," as "a commercial business in the nature of a hotel," or as a "venue for parties, business meetings, or retreats."

The Zgabays contend that the "single family residential purposes" restriction only prohibits multiple families staying in the same building. The Court should reject the Zgabays' interpretation for the following reasons.

First, the Zgabays' interpretation does not give effect to the term "residential." The restriction at issue is not simply and solely a restriction that only a single family at a time can occupy the house. The use of the house must be residential, rather than non-residential. The Zgabays' interpretation is that any use

11

of the house by a single family is *per se* residential. The Zgabays argue that using the house for activities such as brushing one's teeth and sleeping makes the use residential. If that were the case, any rental of a hotel room for any length of time, even by the hour, would also be residential. The Zgabays' interpretation is simply untenable.

Second, this Court has never adopted such a strained reading of a single-family residential use restriction. This Court, in an ancillary order in *Wein*, found the homeowner to be in contempt of the injunction prohibiting him from operating his transient rental business when he rented the entire house for a family reunion weekend. *See* Contempt Order, attached hereto in the Appendix. According to this Court's rationale, renting an entire house for a family reunion (and therefore presumably solely to members of a single family) constitutes using the property for a business or commercial, not residential, purpose. This rationale is consistent with the Texas Supreme Court's holding in *Southampton Civic Club v. Couch,* 322 S.W.2d 516 (Tex. 1959). Nothing in this Court's opinion in *Wein* nor in its contempt order suggests that the injunction against Mr. Wein impliedly authorized transient rentals so long as the rental was to a single family.

Third, the Zgabays' interpretation would allow rentals with no durational constraints, in direct contradiction to Texas law interpreting a "residential" use to require physical presence and an intent to remain—which a transient tenant does

not have. *Benard*, 990 S.W.2d at 932 (quoting from and citing *Mills v. Bartlett,* 377 S.W.2d 636, 637 (Tex. 1964)). Again, the Zgabays argue that doing things such as brushing one's teeth and sleeping, for whatever amount of time, necessarily means that you are using that location (whether it be a house, a hotel, or other lodging) for residential purposes. The Zgabays' argument is simply wrong. While there may be many things that people can do in a house they rent only for a weekend getaway, "it is not what the individuals do to occupy their time while on the property that is forbidden; it is the fact that the property is being held out for remuneration in much the same manner as a hotel or motel." *Vonderhaar v. Lakeside Place Homeowners Assoc., Inc.*, No. 2012-CA-002193-MR, 2014 Ky. App. Unpub. LEXIS 637, at *11 (Ky. Ct. App. Aug. 8, 2014).[5]

Fourth, the Zgabays offer no principled reason why their presence or absence from the house while it is rented for transient purposes makes any difference. The Zgabays' position is that the "single family residential purposes" restriction only applies if the Zgabays are present in the house along with their renters. The Zgabays concede that the restriction prohibits them from renting Bedroom A in the house to a student and Bedroom B in the house to another, unrelated, person. The Zgabays contend, however, that the far more commercially

---

[5] Unpublished opinions of Kentucky appellate courts may be cited, per Kentucky Rule of Civil Procedure 76.28(4)(c), "for consideration by the court if there is no published opinion that would adequately address the issue before the court." Ky. R. Civ. P. 76.28(4)(c). A copy of the opinion is attached in the appendix. .

13

intensive act of moving completely out of the house, not using it as their residence, and renting the entire house for transient stays for financial gain are somehow not a commercial use of the property. Whether the use is residential or commercial does not turn on whether the Zgabays are present during the rental. Their presence or absence during the rental simply has nothing to do with determining whether the Zgabays' transient rentals are single-family residential purposes. Again, nothing in this Court's opinion in *Wein* nor in this Court's contempt order suggests that the result in the case depended upon whether Mr. Wein was renting to more than a single family or whether he was also present at the house along with the renters.

Fifth, the consanguinity of the renters and whether the owner is present may affect whether the rental violates the "single family" restriction, but they have no relevance to determining whether the rental is a residential use. The single-family residential purposes restriction does not allow non-residential or transient rentals, regardless of whether the tenants are a single family or a group of college buddies, and regardless of whether the owner stays in the house or is absent. This court has made clear that operating restricted property as a business *in the nature of a hotel* is a prohibited business or commercial use. *Wein*, 2005 Tex. App. LEXIS 7477. The relevant nature of a hotel is not that it might limit rentals to unrelated individuals. There are often times that entire hotels or lodging establishments are fully rented by a single family (for reunions, weddings, etc.). The relevant nature

14

of a hotel is not that the owner or manager is off-site (there are numerous examples of hotel owners or managers who also live at the establishment). The relevant nature of a hotel is that it is a place for transient stays. The fact that a single family is staying at the hotel does not change the relevant nature of the hotel, because the consanguinity of the renters does not affect the basic nature of what a hotel is.

In any event, this Court made clear in *Wein* that a single-family residential use restriction prohibits not only using the restricted property as an *actual* hotel, but operating it as a business "*in the nature of* a hotel." *Wein*, 2005 Tex. App. LEXIS 7477 (emphasis added). This Court should hold that the Zgabays' transient rentals are, at the very least, "in the nature of a hotel" and therefore prohibited by the restriction limiting use of the property to "single family residential purposes."

As a matter of state law, a transient rental of a house means that such house is a "hotel" for purposes of collecting the hotel occupancy tax. *See* TEX. TAX CODE § 156.001 ("In this chapter, 'hotel' means a building in which members of the public obtain sleeping accommodations for consideration. The term includes a hotel, motel, tourist home, tourist house, tourist court, lodging house, inn, rooming house, or bed and breakfast . . . ."). The hotel occupancy tax is imposed on transient renters, and is not imposed on renters who rent for at least a 30 day term. *See* TEX. TAX CODE § 156.101 (tax is not imposed on "a person who has the right to use or possess a room in a hotel for at least 30 consecutive days . . . ."). These

Tax Code provisions evidence Texas public policy regarding transient rentals—such rentals are "in the nature of a hotel," regardless of the consanguinity of the renters.

Moreover, immediately after passage of the first hotel occupancy tax, the Texas Attorney General recognized that transient rental of property "is an enterprise that is commercial in nature." Tex. Att'y Gen. Op. No. WW-821 (1960), at fn. 1 (courtesy copy attached hereto in the Appendix). That opinion dealt specifically with the hotel occupancy tax, and was in response to a question whether the State Parks Board was a "person" required to collect the tax for its transient cabin rentals. In order to determine whether the State was a "person" required to collect the tax, Attorney General Will Wilson had to determine the exact nature of the activity in question (transient rentals). Specifically, Attorney General Wilson had to determine whether "the sovereign entity involved is acting not in its sovereign capacity but rather is engaging in commercial and business transactions such as other persons, natural or artificial, are accustomed to conduct . . . ." *Id.* He noted in regard to the transient rentals: "Though the renting of cabins in this case may, perhaps, be a non-profit activity, or designed to foster the esthetic, it nevertheless is an enterprise that is commercial in nature." *Id.* He concluded that the State was a "person" and was required to collect the Hotel Occupancy Tax assessed on its transient renters *specifically and precisely because*

the State was engaging in an enterprise (transient rentals) that was commercial in nature. *Id*.; *See also Hyatt v. Court*, No. 2008-CA-01474-MR, 2009 Ky. App. Unpub. LEXIS 738, at \*10-\*11 (Ky. Ct. App. Aug. 28, 2009) (being required to pay the same taxes as is required of motels and hotels "only emphasizes the business-related nature" of transient rentals).[6]

Therefore, when the Restrictions were adopted in 1999, the declarant could not have intended "single family residential purposes" to include transient rentals of residential property because transient rentals subject to the hotel occupancy tax were considered to be "an enterprise that is commercial in nature."[7] *See also Wasson Interests, Ltd. v. City of Jacksonville*, No. 12-13-00262-CV, 2014 Tex. App. LEXIS 7377 (Tex. App.—Tyler July 9, 2014, pet. filed) (mem. op.) (lease limited use of the property to residential use only; City terminated lease when lessee engaged in transient rentals).[8]

---

[6] *See* fn. 5, *supra*. A copy of the opinion is attached in the Appendix.

[7] One of the largest players in the transient rental industry (what they term the "vacation rental industry") concedes that transient rentals are commercial activity. HomeAway, Inc., states in its latest annual report (10-K, Part I, Item I) that HomeAway, Inc. and its subsidiaries operate "the world's largest online marketplace for the vacation rental industry." https://www.sec.gov/Archives/edgar/data/1366684/000119312515062554/d846217d10k.htm. Needless to say, a marketplace presumes commerce. The Zgabays' transient rentals are a part of that market and are a commercial, or at least non-residential, use of the property.

[8] Transient renting is also typically excluded from coverage under a homeowners policy through the exclusion of "business pursuits." *Allstate Ins. Co. v. Sylvester,* No. 07-00360, 2008 U.S.Dist. LEXIS 42386, at \*\*16-20 *(*Dist. Hawaii May 21, 2008)(granting summary judgment to insurer that "business use" exclusion applied when the property was rented by owners to transient renters as part of a vacation rental business).

## C. *The Hotel Occupancy Tax Questionnaire*

The Hotel Occupancy Tax Questionnaire makes clear that transient rentals are a business in the nature of a hotel. A person seeking to engage in transient rentals must represent to the State:

a.  the person's "principal type of business";
b.  the person's "business location name and address";
c.  whether the person's "business" is located within city limits;
d.  the nature of the person's "business activities for [the] location"; and
e.  the "date of the first business operation in the above location that is subject to hotel occupancy tax."

Form AP-102, Texas Questionnaire for Hotel Occupancy Tax (attached hereto in the Appendix). There is simply nowhere on the form for the person engaging in transient rentals to dispute the State's characterization of those transactions as constituting a "business." And, again, the statute defines such transient rental house as a "hotel." The transient-rental business is at least "in the nature of" a hotel.

The State also requires each person seeking to engage in transient rentals to classify that transient-rental business activity by stating the North American Industry Classification System ("NAICS") number applicable to their transient-rental business. *See* Form AP-102, Item 12. The North American Industry Classification System "is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy." UNITED STATES

18

CENSUS BUREAU, http://www.census.gov/eos/www/naics/ (last visited March 13, 2015).  Given that the Questionnaire relates solely to transient-rental activities, it becomes clear that the State of Texas recognizes transient rentals of single-family residences to be commercial activity that may be classified using the NAICS.  The NAICS number for transient rentals of single-family dwellings is 721199 ("All Other Traveler Accommodation").  SICCODE.COM, http://siccode.com/en/naicscodes/721199/all-other-traveler-accommodation (Last visited March 13, 2015).  In contrast, the NAICS number for residential rentals is 531110.  SICCODE.COM, http://siccode.com/en/naicscodes/531110/lessors-of-residential-buildings-and-dwelling#tab-pane-group_naicscode_product-element (Last visited March 13, 2015).

## II.  The Deleterious Effects Of Transient Rentals

Transient rentals have a deleterious effect on neighborhoods.  Some of the most egregious examples are homes that are purchased by investors, never lived in by the investor, and simply rented out to a steady stream of different weekend transient renters.  When Asheville, North Carolina, was looking at regulating transient rentals, they discovered numerous deleterious effects of such transient rentals, such as transients' intensity of activities such as car trips, late-night noise and light, and trash generation; the fact that transient rentals tend to attract large numbers of people, either requiring paved yards or creating parking shortages in

the area; and potentially leading to escalation in area home prices, which may encourage speculative investors to purchase properties while creating conditions that are inhospitable to permanent residents.[9]  These problems relate to the transient nature of the occupancy, not to the lack of consanguinity of the renters.

Many municipal governments have chosen to regulate these transient rental businesses.  One example is the City of Austin, Texas.  In order to preserve the residential character of their neighborhoods, the City of Austin limits non-owner occupied transient rentals such as the Zgabays to no more than 3% of the single-family, detached residential units within the census tract of the property.  CITY OF AUSTIN CODE § 25-2-791(C)(3).[10]

One way of keeping these commercial businesses from infiltrating single-family residential zones is simply to enforce the restrictive covenants as written, and find, consistent with Texas law, that transient rentals are a commercial, or at least non-residential, use.

---

[9]http://www.ashevillenc.gov/Portals/0/city-documents/cityclerk/mayor_and_citycouncil/boards_and_commissions/planning_and_zoning/PAS%20Research%20Response.pdf (last visited March 13, 2015).

[10] Found at https://www.municode.com/library/tx/austin/codes/code_of_ordinances?nodeId=TIT25LADE_CH25-2ZO_SUBCHAPTER_CUSDERE_ART4ADRECEUS_SPCRESHRMREUS_S25-2-791LIRE (last visited March 16, 2015).  Many times, however, government regulation of these commercial businesses are simply ignored.  A simple Google search for "Austin short-term rental ordinance" (without the quotes) shows the fourth result is "5 Ways to Beat Austin's Short Term Rental Licensing Ordinance."  That web page, http://republicofaustin.com/2013/02/19/5-ways-to-beat-austins-short-term-rental-licensing-ordinance-during-sxsw/ (last visited March 9, 2015), advises transient rental owners to "hide your home" and not allow the street view of your unlicensed transient rental listing so as to make it harder for the City of Austin to uncover that illegal activity.

## III.  Conclusion and Prayer

Transient rentals operate in a defined marketplace for their commercial services and many times operate outside the rules.  Moreover, they undermine neighborhoods.  A single family residential purposes use restriction prohibits transient rentals because such rentals are either commercial activity, which is the opposite of residential, or because the transient nature of the rentals are more aptly described as temporary, or for retreat purposes, or transient housing, rather than for residential purposes.  In any event, what the Zgabays are doing is using their residentially-restricted property primarily for financial gain, which the Texas Supreme Court has determined violates a residential use restriction.  This Court should confirm the common sense understanding of single family residential purposes—it prohibits transient rentals.  Because transient rentals are not a single family residential purpose, but are a commercial use in the nature of a hotel, the trial court's judgment should be affirmed.

Respectfully submitted,


The Weichert Law Firm
3821 Juniper Trace, Suite 106
Austin, Texas 78738
(512) 263-2666
(512) 263-2698 - Facsimile


By:        /s/ Darryl W. Pruett

Darryl W. Pruett
Texas State Bar No. 00784795
darryl@weichertlaw.com

George V. Basham, III
Texas State Bar No. 01868000
george@weichertlaw.com

Glenn K. Weichert
State Bar No. 21076500
glenn@weichertlaw.com

**ATTORNEYS FOR AMICI CURIAE**

**<u>CERTIFICATE OF COMPLIANCE WITH WORD LIMIT</u>**

I, Darryl W. Pruett, hereby certify that this brief (exclusive of the portions excepted by rule) contains, according to the computer program used to prepare the document, 5,109 words.

/s/ Darryl W. Pruett
Darryl W. Pruett

22

# CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of Brief of Amici Curiae has been electronically served on the following counsel for Appellants and Appellee on this 16th day of March, 2015:

J. Patrick Sutton
1706 W. 10th Street
Austin, Texas 78703
Telephone: (512) 417-5903
Telecopier: (512) 355-4155

ATTORNEY FOR APPELLANTS

Wade C. Crosnoe
Brian D. Hensley
Thompson, Coe, Cousins & Irons, LLP
701 Brazos, Suite 1500
Austin, Texas 78701
Telephone: (512) 708-8200
Telecopier: (512) 708-8777

Tom L. Newton, Jr.
Allen, Stein & Durbin, P.C.
6243 IH-10 West, 7th Floor
P.O. Box 101507
San Antonio, Texas 78201
Telephone: (210) 734-7488
Telecopier: (210) 738-8036

ATTORNEYS FOR APPELLEES

/s/ Darryl W. Pruett
Darryl W. Pruett

# APPENDIX

## TABLE OF CONTENTS FOR APPENDIX

1. Contempt Order in *Wein v. Jenkins*

2. *Vonderhaar v. Lakeside Place Homeowners Assoc., Inc.*, No. 2012-CA-002193-MR, 2014 Ky. App. Unpub. LEXIS 637, at *11 (Ky. Ct. App. Aug. 8, 2014)

3. Tex. Att'y Gen. Op. No. WW-821 (1960)

4. *Hyatt v. Court*, No. 2008-CA-01474-MR, 2009 Ky. App. Unpub. LEXIS 738, at *10-*11 (Ky. Ct. App. Aug. 28, 2009)

5. Form AP-102, Texas Questionnaire for Hotel Occupancy Tax

# CONTEMPT ORDER

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00568-CV

**Marc Wein, Appellant**

v.

**Maureen Jenkins and William E. Sherman, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
### NO. GN103548, HONORABLE PATRICK O. KEEL, JUDGE PRESIDING

## O R D E R

**PER CURIAM**

Appellees Maureen Jenkins and William E. Sherman sued their neighbor, appellant Marc Wein, alleging that Wein had trespassed and encroached on their property, building stairs and a boat dock partially on their land, and was operating out of his home a commercial bed and breakfast, violating the neighborhood's restrictions and covenants. In late May 2004, a jury found largely in favor of appellees. On July 28, 2004, the trial court signed a final judgment awarding appellees monetary damages and attorney's fees, ordering Wein to remove the offending structures from appellees' property, and permanently enjoining Wein from operating the bed and breakfast, effective immediately. The trial court's judgment was clear and unambiguous in its order that Wein cease operating his commercial business from his home.

On September 2, Wein filed his notice of appeal; appellees received notice of his appeal on September 7. Also on September 2, appellees filed a motion for contempt in the trial

court, asserting that Wein was violating the injunction and continuing to use his home as a bed and breakfast. On September 20, the trial court held a hearing on appellees' motion. At that hearing, Wein raised the issue of the trial court's jurisdiction, asserting that the trial court lost jurisdiction when he filed his notice of appeal. The court conducted an evidentiary hearing, but declined to enter an order or assess sanctions, leaving that to this Court.

On October 4, appellees filed in this Court a "motion for judgment on plaintiffs' motion for contempt," asking that Wein be jailed until he "purged himself" of his contempt. Wein asserts that (1) the evidence put forth in the trial court's hearing should be disregarded because the trial court lacked jurisdiction, (2) he should not be jailed because there was no evidence that he is currently violating the order, and (3) appellees should not be awarded attorney's fees because they did not act with due diligence in filing their motion for contempt and proceeding with the hearing before the trial court. We held a show-cause hearing on October 27 to address this issue.

The supreme court has stated, "For appealable orders in the nature of an injunction, in which the validity of the order alleged to have been violated is itself in issue in the appeal, the appellate court alone is vested with jurisdiction to enforce the injunctive provisions by contempt." *Schultz v. Fifth Judicial Dist. Court of Appeals at Dallas*, 810 S.W.2d 738, 740 (Tex. 1991). In such a case, this Court "may exercise that jurisdiction by referring to the trial court the fact finding burden of hearing testimony and taking evidence, but the appellate court where the appeal is pending must exercise jurisdiction to actually issue the contempt judgment." *Id*. at 740-41; *see In re Goldblatt*, 38 S.W.3d 802, 804 (Tex. App.—Fort Worth 2001, orig. proceeding); *Roosth v. Daggett*, 869 S.W.2d 634, 636-37 (Tex. App.—Houston [14th Dist.] 1994, orig. proceeding); *see also In re*

*Taylor*, 39 S.W.3d 406, 410-11 (Tex. App.—Waco 2001, orig. proceeding) (in family law case, portion of order allegedly violated was not mentioned in direct appeal and therefore trial court retained jurisdiction to enforce that portion of order by contempt).  Unless the injunction is void, its propriety is not an issue—the only issue is whether the injunction was violated.  *See Fort Worth Driving Club v. Fort Worth Fair Ass'n*, 121 S.W. 213, 216 (Tex. Civ. App.), *rev'd on other grounds*, 122 S.W. 254 (Tex. 1909).

Wein urges that this Court must disregard evidence heard by the trial court because the court lacked jurisdiction over the issue of contempt once Wein filed his notice of appeal.[1]  Wein argues that instead we should remand the cause to the trial court to hold a second hearing on the issue, essentially granting the trial court jurisdiction to hold a specific hearing.  We disagree.  Wein acknowledges that we have the authority to refer the cause to the trial court for fact finding, *see*

---

[1] Wein points to *Morrison v. State*, 132 S.W.3d 37 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd), and *Hagens v. State*, 979 S.W.2d 788 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd), both criminal cases concerning hearings on motions for new trial conducted after the trial courts lost jurisdiction of the cases.  In *Hagens*, the court stated:

> While we may have the authority to reverse a judgment and remand the cause for ineffective assistance of counsel manifestly appearing in the record at the hearing on a defendant's motion for new trial, we have no authority to extend the deadlines for filing a motion for new trial.  Because we have no authority to order the trial court to conduct a hearing on an out-of-time motion for new trial, we have no authority to consider the record prepared at such a hearing.

979 S.W.2d at 792 (citation omitted).  In *Morrison*, the court refused to consider evidence brought forth at a hearing held after the trial court denied the timely filed motion by written order and after the motion for new trial would have been overruled as a matter of law.  132 S.W.3d at 48.  *Morrison* does not answer the question raised by *Hagens* of whether the court could extend the deadline for the hearing in spite of the order overruling the motion and the running of the time in which the motion would otherwise have been overruled as a matter of law.

*Schultz*, 810 S.W.2d at 740, and we have the authority to conduct our own evidentiary hearing on a motion for contempt, although referring a cause to the trial court for fact finding generally is preferred. *In re Werblud*, 536 S.W.2d 542, 544-45 (Tex. 1976); *In re Reed*, 901 S.W.2d 604, 610-11 (Tex. App.—San Antonio 1995, orig. proceeding). Although the trial court held an evidentiary hearing, it did not take any "action" that would be void for lack of jurisdiction aside from verbally finding that Wein was in contempt.[2] Because we may perform a fact finding on the issue of contempt, *see Werblud*, 536 S.W.2d at 544-45, we will make our own finding of contempt based on this record. Accordingly, we disregard the trial court's verbal finding of contempt and will consider the evidence brought forth at the hearing before the trial court. To refer the cause to the trial court for a second hearing on the same issues, as urged by Wein, would accomplish nothing but a waste of time and judicial resources.

At the hearing, appellees presented evidence that Wein had continued to operate his business after the trial court permanently enjoined him from doing so. Appellees presented information taken from Wein's website on September 20, 2004, still advertising his bed and breakfast as a "unique luxury retreat." The evidence shows that the bed and breakfast had at least six rooms and provided breakfasts and other amenities and services. Appellees brought forth evidence that Wein rented the entire house for a family reunion the weekend of August 6 through August 8, billing the family about $7,000. The man who rented the house for the reunion testified that Wein told him that the residence "was busy," and that "some sort of wedding party . . . was

---

[2] The jurisdictional issue appears to have been first raised in Wein's response to appellees' motion for contempt, filed on September 20, 2004. The trial court was faced at the time with a motion for contempt filed before appellees learned that Wein had appealed.

4

coming in after us." Appellees also introduced portions of Wein's May deposition, during which he testified about a wedding that was planned for August 11. The record does not reflect whether that wedding was actually held at Wein's bed and breakfast. Disregarding the trial court's legal conclusion that Wein had committed contempt, we find and conclude, based on the uncontroverted evidence,[3] that Wein continued to operate his bed and breakfast well after the trial court signed its order and thus was in contempt of court.

The government code provides a limit of $500 in fines per instance of contempt. Tex. Gov't Code Ann. § 21.002(b) (West 2004); *In re Long*, 984 S.W.2d 623, 625 (Tex. 1999). In assessing a penalty, we may not divide a single act of contempt into separate acts and assess punishment for each allegedly separate act. *Long*, 984 S.W.2d at 625. Nor may we assess attorney's fees as sanctions for contempt. *Wallace v. Briggs*, 348 S.W.2d 523, 525-26 (Tex. 1961); *In re Wieses*, 1 S.W.3d 246, 251 (Tex. App.—Corpus Christi 1999, orig. proceeding); *Ex parte Dolenz*, 893 S.W.2d 677, 680 (Tex. App.—Dallas 1995, orig. proceeding). A person in contempt may be confined to jail "to vindicate the court's authority," *Dolenz*, 893 S.W.2d at 677, but the term of imprisonment must be for the lesser of 18 months or end upon compliance with the court order. Tex. Gov't Code Ann. § 21.002(h)(2).

---

[3] We note that, at the show-cause hearing before this Court, Wein and his attorney admitted that Wein had rented the house for the family reunion and stated that the website had been taken down. At the time of the show-cause hearing before this Court, Wein's website was still operational, and on November 8, appellees' counsel informed the Court that as of November 5, the website was still operating and soliciting reservations. The website has since been changed to show only a message that states, "Site Temporarily Unavailable." These facts alone, admitted by Wein before this Court, are grounds for holding Wein in contempt.

There is no evidence that Wein is still operating his bed and breakfast and therefore there is no evidence that he is currently in contempt of which he must be "purged." Thus, we will not commit Wein to jail, as requested by appellees. *See id*. Nor may we award attorney's fees incurred by appellees in pursuing these contempt proceedings. *See Wallace*, 348 S.W.2d at 525-26. We may assess a fine, capped at $500 per instance of contempt. *See Long*, 984 S.W.2d at 625. During August, Wein continued to operate his bed and breakfast and rented out the entire house for at least one full weekend. Leading up to the weekend, Wein corresponded with the would-be guests, emailing them and telling them how to get directions to the house and providing a gate code to gain entry to the neighborhood and information about use of the boat dock. Wein continued to solicit business through his website well into the fall of 2004. In our view, Wein's actions amount to four instances of contempt in total—one for each day during which Wein allowed his house to be used in August as a bed and breakfast in violation of the trial court's order, and one for his continuing to solicit bed and breakfast reservations through his website after the court signed its order.

Accordingly, the Court hereby ORDERS, ADJUDGES, and DECREES that Marc Wein is in contempt of court for violating the trial court's order of July 28, 2004, by having let out his home as a commercial bed and breakfast on August 6, 2004.

For this violation, the Court orders that Marc Wein shall be fined $500.00.

The Court further ORDERS, ADJUDGES, and DECREES that Marc Wein is in contempt of court for violating the trial court's order of July 28, 2004, by having let out his home as a commercial bed and breakfast on August 7, 2004.

For this violation, the Court orders that Marc Wein shall be fined $500.00.

6

The Court further ORDERS, ADJUDGES, and DECREES that Marc Wein is in contempt of court for violating the trial court's order of July 28, 2004, by having let out his home as a commercial bed and breakfast on August 8, 2004.

For this violation, the Court orders that Marc Wein shall be fined $500.00.

The Court finally ORDERS, ADJUDGES, and DECREES that Marc Wein is in contempt of court for violating the trial court's order of July 28, 2004, by continuing to operate his website and solicit business for several months after the issuance of the trial court's order.

For this violation, the Court orders that Marc Wein shall be fined $500.00.

We thus order Wein to pay a fine of two thousand dollars ($2,000) to the Clerk of the Third Court of Appeals no later than 5:00 p.m. on March 17, 2005.  If Wein fails to pay the fine timely, it shall be collectible in the manner provided by law.

It is further ordered that all costs be adjudged against Marc Wein.

It is ordered on February 15, 2005.


Before Chief Justice Law, Justices B. A. Smith and Pemberton

7

# Vonderhaar v. Lakeside Place Homeowners Assoc., Inc.

No *Shepard's* Signal™
As of: March 12, 2015 8:53 PM EDT

# Vonderhaar v. Lakeside Place Homeowners Ass'n

Court of Appeals of Kentucky

August 8, 2014, Rendered

NO. 2012-CA-002193-MR

**Reporter**
2014 Ky. App. Unpub. LEXIS 637; 2014 WL 3887913

PATRICK VONDERHAAR; CAROLEE VONDERHAAR; RONALD ADAMS; AND LISA ADAMS, APPELLANTS v. LAKESIDE PLACE HOMEOWNERS ASSOCIATION, INC., APPELLEE

**Notice:** THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

**Prior History:** [*1] APPEAL FROM RUSSELL CIRCUIT COURT. HONORABLE VERNON MINIARD, JR., JUDGE. ACTION NO. 09-CI-00537.

**Counsel:** BRIEF FOR APPELLANTS: Harlan E. Judd, Bowling Green, Kentucky.

BRIEF FOR APPELLEE: M. Gail Wilson, Jamestown, Kentucky.

**Judges:** BEFORE: CAPERTON, COMBS, AND DIXON, JUDGES. ALL CONCUR.

**Opinion by:** CAPERTON

# Opinion

AFFIRMING

CAPERTON, JUDGE: The Appellants, Patrick and Carolee Vonderhaar and Ronald and Lisa Adams, appeal from the October 5, 2012, findings of fact, conclusions of law, and summary judgment/injunction issued by the Russell Circuit Court in favor of Appellee, Lakeside Place Homeowners Association, Inc. (hereinafter "Lakeside"), based upon the finding that Appellants had violated the Declaration of Covenants and Restrictions of Lakeside Place in light of the fact that they utilized their property for commercial purposes. Upon review of the record, the arguments of the parties, and the applicable law, we affirm.

The Appellants, the Adamses and Vonderhaars, are co-owners in fee of a single family home located in the Lakeside subdivision, in Russell County, Kentucky. Lakeside Place Homeowners Association is a homeowners association designated to preserve and protect the interest of the real property owned by its members [*2] in Lakeside Place subdivision located in Russell County, Kentucky.

The Declaration of Covenants and Restrictions of Lakeside Place was executed on July 20, 1988, by developers Donald H. Byrom and Larry Kinnett. These restrictions were recorded in the Russell County Clerk's Office on January 20, 2002. Lakeside instigated litigation to seek injunctive relief against Appellants, based upon the assertion that they were in violation of the Declaration of Covenants and Restrictions because the Declaration restricted the use of the land in the subdivision to single family residential purposes only, and there were to be no business, commercial, trade, or professional uses permitted.

Article VII of the Declaration, entitled Building and Use Restrictions, stated as follows:

Section 1. Single Family Residential Use. Each lot (including land and improvements) shall be used and occupied for single family residential purposes only. No owner or other occupant shall use or occupy his lot, or permit the same or any part thereof to be used or occupied, for any purpose other than as a private single family residence for the Owner or his tenant and their families. As used specifically, but
without limitation, the [*3] use of Lots for duplex apartments, garage apartments, or other apartment use. No lot shall be used or occupied for any business, commercial, trade, or other professional purpose either apart from or in connection with the use thereof as a private residence, whether for profit or not.

The Appellants originally purchased their first lot in Lakeside Place, Lot 22, in the early 1990s. At that time, the Adamses sought an opinion letter from the developer, Don Byrom, granting them the ability to rent their property in the neighborhood on a short-term basis. That letter was written by Byrom. After a home was constructed on this lot, the Appellants engaged in renting the home on Lot 22 for several years prior to the purchase of the second lot, Lot 13. Appellants subsequently purchased Lot 13.

Other homeowners in Lakeside became concerned when the Appellants built a house on Lot 13 in Lakeside that they immediately began to use as a short-term rental facility, rather than as a single family residence. The Appellants advertised the property for rent on various websites, including for periods of time as short as three nights.

In his deposition, Ronald Adams confirmed that the tax returns for the [*4] years 2007 and 2008 indicated that the rental property was listed as a "motel." The Appellants' income tax returns were submitted into evidence below and indicated the rents received as income as well as expenses, including cleaning, maintenance, repairs, supplies, utilities, insurance, legal and professional fees, and depreciation of the property. Additionally, Appellants paid the required Russell County Tourist and Convention Commission Transient Room Tax and the Kentucky Sales Use and Transient Room Tax, as is required of motels, hotels, and persons renting their property for a short period of time.

Lakeside asserted that Appellants made short-term rentals to large groups of people who created a noise disturbance, played loud music, and left trash in the roadway, in addition to leaving cars parked in the roadways, which created problems for traffic movement on the subdivision roads.

As noted, on October 5, 2012, the Russell Circuit Court entered a judgment restricting the Appellants from any rental or lease activity on their property. It is from that judgment that Appellants now appeal to this Court.

As their first basis for appeal, Appellants argue that the trial court erred in determining [*5] that the Declaration prevents rentals because it specifies a "tenant" as a permissible party and provides no specific detail as to length of time that the property can be rented. Appellants assert that Article VII of the Declaration plainly states that the use of the property by "tenant" for single family purposes is acceptable, and notes that in order to preclude the Appellants' rental activities, the Declaration would have had to use the term "tenant" to clearly and specifically prohibit any "rental or leasing" of the properties subject to the Declaration. Appellants assert that restrictive covenants should be strictly construed against those seeking to enforce them, and that in this instance the covenant was not specific enough to restrict rental activity of the properties at issue. Appellants also assert that Kentucky should move toward accepting a more modern approach which favors an unfettered use of land, and urge this Court to find accordingly.

In conjunction with their argument that the trial court erred in determining that the Declaration prevents rentals, Appellants argue that the trial court erred because it "refused to see" that Article VII was subject to
more than one [*6] interpretation and is therefore ambiguous. Appellants assert that though the court attempted to distinguish a "lease" from a "rental," the Declaration itself makes no such distinction and is at best ambiguous on this point. Appellants assert that if ambiguity on this issue exists, the facts make clear that the drafters of the Declaration clearly intended to allow rental arrangements and that no specification was made as to how long the property could be rented or leased.

Further, Appellants argue that the trial court erred in determining that Appellants' rental was a "business use," or that, alternatively, this creates a second ambiguity in the Declaration. While the court found that the short-term rentals of Appellants' property were a "business use," Appellants argue that merely receiving money for the rented property did not mean that the property was being utilized for "non-residential," or

"business use" purposes. Alternatively, Appellants argue that the Declaration was at best ambivalent on this point.

In response to the first four arguments made by Appellants, Lakeside argues that the trial court properly determined that the rental of the house located on Lot 13 of Lakeside was [*7] in violation of Article VII of the Declaration. Lakeside asserts that by virtue of advertisements on the internet, tax returns indicating that the business use for the property was a "motel," and by payment of the hotel and motel tax of Russell County, the Appellants could present no proof that they were not engaged in a commercial enterprise in the rental of their home.

In addressing this issue, we note that interpretation of a restrictive covenant is a matter of law appropriate for de novo review by this Court. *Colliver v. Stonewall Equestrian Estates Ass'n, Inc.*, 139 S.W.3d 521, 522-23 (Ky. App. 2003). Upon review, we note that there are no factual disputes between the parties and, accordingly, we focus solely on interpretation of the Declaration as a matter of law.[1] In so doing, we turn first to applicable precedent. It is clearly established that when attempting to construe ambiguous restrictive covenants the party's intention governs. *See Glenmore Distilleries v. Fiorella*, 273 Ky. 549, 554, 117 S.W.2d 173, 176 (1938). If known, the surrounding circumstances of the development are likewise an important consideration when ambiguous language creates a doubt as to what the creators intended to be prohibited. *Brandon v. Price*, 314 S.W.2d 521, 523 (Ky. 1958). Thus, the construction may not be used to defeat the obvious intention of the parties though that intention may not be precisely expressed. *Connor v. Clemons*, 308 Ky. 9, 213 S.W.2d 438 (1948) [*8] .

Furthermore, we note that Kentucky has approached restrictive covenants from the viewpoint that [*10] they are to be regarded more as a protection to the property owner and the public rather than as a restriction on the use of property, and that the old-time doctrine of strict construction no longer applies. *Highbaugh Enterprises*

---

[1] In addressing this issue, we also direct the parties to our previous unpublished opinion in *Hyatt v. Court*, 2009 Ky. App. Unpub. LEXIS 738, 2009 WL 2633659 (Ky. App. 2009), which we cite pursuant to Kentucky Rules of Civil Procedure 76.28(4), and which we believe to be directly on point in this matter. In *Hyatt*, as was the case with the Appellants *sub judice*, the Hyatts advertised their home on the internet, and charged a cleaning fee, security deposit, and a charge for Kentucky sales tax.

This Court ultimately found that the Hyatts were using their property as a business, stating:

> Merriam-Webster's 2009 Online Dictionary defines commercial as of or relating to commerce, which is defined as the exchange or buying or selling of commodities on a large scale involving transportation from place to place, and is synonymous with business. There can be no doubt that the Hyatts define their rental enterprise as a business. The Hyatts cannot label the rental of their vacation home one thing to the Internal Revenue Service and characterize it to the contrary to this Court.

> The Hyatts urge us to note that the people who rent their property engage in the very same recreational activities as do the owners or their guests who reside in the dwellings within the Sherwood Shores subdivision. While this may indeed be the [*9] case, it is not what the tenants do to occupy their time while on the property that is forbidden, it is the fact that the property is being held out for remuneration in much the same manner as a hotel or motel that is restricted.

> The creators of the subdivision plainly intended to restrain deed-holders from engaging in anything more than recreation while using their property. Such is the privilege of the creators. That the other property owners seek to enforce the protections of the restrictive covenants is their right.

> What is equally clear is that the Hyatts have gone to a great deal of trouble to treat their vacation property as a business. The rental agreement, copyrighted web-site, check-in and check-out times, and the supply of various sundries to tenants, underscore the appropriateness of this commercial classification. Further, the fact that the Hyatts are required to pay the same taxes as is required of motels and hotels only emphasizes the business-related nature of their endeavor. It is unmistakable that the Hyatts have violated the restrictive covenant as the trial court found.

*Hyatt*, 2009 Ky. App. Unpub. LEXIS 738, [WL] at *4.

*Inc. v. Deatrick and James Construction Co.*, 554 S.W.2d 878, 879 (Ky. App. 1977).

Indeed, in 1952, our Supreme Court noted:

> [W]e are among the jurisdictions which adhere to the concept that such restrictions constitute mutual, reciprocal, equitable easements of the nature of servitudes in favor of owners of other lots of a plot of which all were once a part; that they constitute property rights which run with the land so as to entitle beneficiaries or the owners to enforce the restrictions, and if it be inequitable to have injunctive relief, to recover damages. *Crutcher v. Moffett*, 205 Ky. 444, 266 S.W. 6; *Starck v. Foley*, 209 Ky. 332, 272 S.W. 890, 41 A.L.R. 756; *Doll v. Moise*, 214 Ky. 123, 282 S.W. 763; *Bennett v. Consolidated Realty Co.*, 226 Ky. 747, 11 S.W.2d 910, 61 A.L.R. 453.

*Ashland-Boyd County City-County Health Dept. v. Riggs*, 252 S.W.2d 922, 924-25 (Ky. 1952).

Having thus expressed the state of the law in the Commonwealth concerning restrictive covenants, we now turn to the factual scenario before us. *Sub judice*, the Appellants have labeled their home as a "motel," for tax purposes, have treated it as a business, have advertised it on various websites, have a rental agreement along with check-in and check-out times, and pay taxes required of hotels and motels. Upon review of the record, it is clear that the Appellants define their rental enterprise as a [*11] business, and have indeed stated as much to the Internal Revenue Service. They cannot now characterize it to the contrary to this Court.

While the Appellants argue that the individuals who rent their property engage in the very same recreational activities as do the owners or their guests who reside in the dwellings permanently, or as is the case for long-term rentals, we do not find the activities of the occupants to be determinative. Indeed, it is not what the individuals do to occupy their time while on the property that is forbidden; it is the fact that the property is being held out for remuneration in much the same manner as a hotel or motel.

Upon review of the record and the testimony of the parties, we believe that the creators of the subdivision did not intend for properties in the subdivision to be utilized as motels or hotels in the manner in which Appellants are currently utilizing their property. That the other property owners seek to enforce the protections of the restrictive covenants is their right. We are in agreement with the court below that Appellants have violated the restrictive covenant and, accordingly, we believe the trial court appropriately granted summary [*12] judgment.

Having so found, we now turn to the Appellants' fifth basis for appeal, namely that the trial court erred in ordering the Appellants to produce their income tax returns which they assert are confidential, privileged materials. Appellants assert that they stipulated the fact that they were renting the property for profit as a single-family rental and that, accordingly, their tax returns were not relevant to any material issue in this matter, particularly because there is no claim for punitive damages.

In response, Lakeside argues that the trial court properly ordered Appellants to provide their tax returns. Lakeside asserts that as part of discovery, it had requested income tax returns from Appellants which, when provided, indicated that the "business purpose" for the house rental was designated as "motel" on the Schedule C for tax year 2007, that expenses were deducted, and that the property was depreciated. Accordingly, Lakeside argues that the tax returns were clearly relevant as to the use of the property. We agree.

Pursuant to Kentucky Rules of Evidence 401, "relevant evidence" is that which has a tendency to make the existence of any fact that is of consequence to the determination of the action more [*13] probable or less probable than it would be without the evidence. *Sub judice*, we are in agreement with Lakeside and the court below that the designation of the property for tax purposes was relevant and, accordingly, we decline to reverse on this basis.

As their sixth and final basis for appeal, Appellants argue that the trial court erred in depriving them of a jury trial on their "waiver" argument. Appellants assert that they had rented or leased their two properties in the subdivision for years without contest from the homeowner's association. They assert that they asked Attorney Byrom if the property in the subdivision could be rented and he agreed. Moreover, Appellants note that Byrom sent them a letter, which has since been misplaced, indicating that the property could be rented. Appellants assert that their testimony as to the contents

of this letter was uncontroverted. Accordingly, they argue that this permission, in conjunction with the length of time they had rented the properties without objection, amounted to waiver of any right that might otherwise have existed.

In response to Appellants' argument concerning waiver, Lakeside argues that the trial court properly held that there [*14] was no waiver of the Declaration. Lakeside asserts that while other homeowners may have rented their property to other parties for long-term periods of time, this was different than the short-term rentals *sub judice* and in no way constituted a waiver of the covenants and restrictions contained in the Declaration. Again, we agree.

As our Kentucky Supreme Court previously held in *Hardesty v. Silver*, 302 S.W.2d 578, 582 (Ky. 1956):

> Where the restrictive covenant has not been rigidly enforced, and where certain structures and uses have been tacitly permitted which are violative of the strict terms, but where, in spite of such relaxation, there still remains something

of substantial value to those entitled to benefit by its provisions, they are still entitled to enforce it insofar as they were not affected by the principles of estoppel and waiver.

We agree with Lakeside and the court below that there is a significant difference between a long-term rental of a property by one family in contrast to short-term rentals by different individuals or families every weekend. While the restriction may not have been rigidly enforced with respect to long-term rentals, Lakeside retained the right to do so with respect to the short-term rentals because [*15] the continued enjoyment of the subdivision by all homeowners was an ongoing interest of substantial value. Accordingly, we affirm.

Wherefore, for the foregoing reasons, we hereby affirm the October 5, 2012, findings of fact, conclusions of law, and summary judgment/injunction issued by the Russell Circuit Court granting summary judgment in favor of Appellees, the Honorable Vernon Miniard, Jr., presiding.

ALL CONCUR.

# Attorney General Opinion WW-821



# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN 11, TEXAS

WILL WILSON
ATTORNEY GENERAL

March 25, 1960

Mr. E. B. Camiade
State Parks Board
Austin, Texas

Dear Mr. Camiade:

Opinion No. WW-821

Re: Under House Bill 11, Acts
of the 56th Legislature,
Third Called Session, 1959,
is the Texas State Parks
Board required to collect the
Hotel Occupancy Tax on rooms,
cabins and camping shelters
owned and operated by the
Parks Board.

By your letter dated January 11, 1960, you request an
opinion on four questions relating to the application
of the Hotel Occupancy Tax to rooms, cabins and camping
shelters owned and operated by the State Parks Board.

In describing the subject accommodations, you state:

"The revenue derived from the charges
made for the use of said rooms, cabins and
camping shelters is deposited by the employee
of the Texas State Parks Board handling said
rentals in a local bank fund, called a Con-
cession Account. Out of said Concession
Account, the employee pays for all expenses
incurred in operating and maintaining said
rooms, cabins and camping shelters. The
Parks Board authorizes the employee to re-
tain 20% of the money left in the Concession
Account after paying all expenses of opera-
tion and maintenance, as compensation for
his work in handling said rentals. This
compensation is handled as wages, and is
reported accordingly for social security
and withholding tax purposes by the Texas
State Parks Board. The other 80% of the
money left in the Concession Account is
deposited in the State Treasury in the State
Parks Fund, and used for operation, maintenance
and repairs to the State Parks of Texas."

Your first question is whether the State Parks Board is
required to collect the Hotel Occupancy Tax.

The tax in question is imposed upon the occupant (except "permanent residents") of any building or buildings in which the public may, for a consideration, obtain sleeping accomodations where the cost of occupancy of the space furnished is at the rate of two dollars ($2.00) or more per day.  See Art. 23.01 (a), Art. 23.02 (a) and Attorney General's Opinion No. WW-706 (September 21, 1959).  Only hospitals, sanitariums, and nursing homes are excepted from the definition of "hotels."  Every "person" owning, operating, managing or controlling a "hotel" is required to collect the tax and make remittance to the State.  Arts. 23.03 and 23.04.  "Person" is defined to mean any individual, company, corporation, or association owning, operating, managing or controlling any hotel.

The term "person" as extended to include "corporation" may include the State (thereby, obviously, including all State components or "functioning arms") where such an intention is manifest.  The fact that a State is, in the generic sense, a corporation is a proposition having roots in judicial antiquity. Witness the following statement from Chisholm, Executor, v. Georgia, 1 U.S. (Curtis) 17, 36, 2 U.S. (Dall.) 419, 447 (1793):

> "The word 'corporation', in its largest sense, has a more extensive meaning than people generally are aware of.  Any body politic, sole or aggregate, whether its powers be restricted or transcendent, is in this sense 'a corporation'.  The king, accordingly, in England, is called a corporation.  10 Co. 29, b.  So also, by a very respectable author (Sheppard, in his abridgement, (Vol. 431) is the parliament itself. In this extensive sense, not only each State singly, but even the United States may without impropriety be termed 'corporations'.  I have, therefore, in contradistinction to this large and indefinite term, used the term 'subordinate corporations'; meaning to refer to such only (as alone capable of the slightest application, for the purpose of the objection) whose creation and whose powers are limited by law."

The United States Supreme Court has not departed from the foregoing interpretation.  See Cotten v. United States, 11 How. 229, 231-232, 52 U.S. 229 (1850); Ohio v. Helvering, 292 U.S. 360 (1934); Georgia v. Evans, 316 U.S. 159 (1942); see also United States v. Cooper Corporation, et al., 312 U.S. 600 (1941); Stanley v. Schwalby, 147 U.S. 508 (1893); Helvering v. Stockholms Enskilda Bank, 293 U.S. 84 (1934); Far East

Conference v. United States, 342 U.S. 570 (1952); Respublica v. Sweers, 1 U.S. Dall. 41 (1779) and Helvering v. British-American Tobacco Company, Ltd., 69 F.2d 528 (C.C.A. 2nd Cir. 1934) aff'd. 293 U.S. 95. In Georgia v. Evans, supra, the wording of the definition of person was, insofar as pertinent, identical to the definition in issue. There the question was whether the State of Georgia was a "person" within the meaning of the Sherman Anti-Trust Act (26 State. 209, 210) for the purpose of instituting a civil action for treble damages. Section 8 of the act defined "person" as "corporations and associations existing under or authorized by the laws of any of the territories, the laws of any State, or the laws of any foreign country." The Court, speaking through Justice Frankfurter, pointed out that whether "person" includes a State or the United States depends upon its legislative environment, and that the following may be considered in construing the term: (1) the structure of the Act; (2) its legislative history; (3) the practice under it; (4) past judicial expressions. Applying these principles, the Court held that the State of Georgia was a "person" within the foregoing definition.

Other authorities less impressive than the Supreme Court have held that the State is a corporation. See Burke v. Railroad Retirement Board, 165 F.2d 24 (C.C.A., D.C. 1947) (in which it was held that the Allegheny County, Pennsylvania, Orphans Court was a person within the meaning of the Railroad Retirement Act (50 Stat. 309) because the context and purpose of the Act required the term, as extended to include "corporation," to include a governmental body); Isner v. Interstate Commerce Commission, 90 F.Supp. 361 (U.S.D.C., S.D. Mich. 1950) (in which the Court, relying on T. & P. Ry. Co. v. I.C.C., 162 U.S. 197; RRD. Labor Board, 258 U.S. 158, and Utah State Building Commission v. Great American Indemnity Co., 140 P.2d 763, held that the I.C.C. is a "corporation"); Indiana State Toll-Bridge Commission v. Minor, 132 N.E.2d 282 (1956) (in which it was held that the Toll-Bridge Commission, a body politic and corporate, was a corporation); and Indiana v. Woram, 40 Am.Dec. 378 (holding the State to be a "corporation" and a "person" within the meaning of the statute providing that all notes in writing and signed by any "person" are negotiable).

The case of United States v. Coumantaros, 165 F.Supp. 695 (U.S.D.C., Md. 1958) contains an exhaustive review of authorities on this subject. It is even pointed out, in a quote from Helvering v. Stockholms Enskilda Bank, supra, that Blackstone, the eminent authority on all matters pertaining to law, had this to say (1 Bl. 123):

"Persons are divided by the law into
either natural persons, or artificial.

> Natural persons are such as the God of
> nature formed us; artificial are such as
> are created and devised by human laws for
> the purposes of society and government,
> which are called corporations or bodies
> politic." (Emphasis added.)

Based on its lengthy discussion, the Court concluded that the
United States is a "person" and "body corporate" within a
Maryland statute providing that every person and body corporate
that has the right to become a plaintiff in any action or
proceeding shall have the right to become a plaintiff in an
attachment against a non-resident. In so holding, the Court
makes the following statement which is particularly appropos
to the instant situation:

> "By analyzing those decisions holding that
> the sovereign is a person or body corporate,
> it may be found that one or more of the follow-
> ing factors are present and it may be con-
> cluded that their presence determines the
> reasonableness of such a construction of the
> statute in question and the manifestation of
> legislative intent to include the sovereign.
> Generally the sovereign entity involved is
> acting not in its sovereign capacity but
> rather is engaging in commercial and business
> transactions such as other persons, natural
> or artificial, are accustomed to conduct,
> usually in addition, when a statute is construed
> so as to include the sovereign within its terms,
> no impairment of sovereign powers results
> thereby and rights and remedies are given
> rather than taken away."

Analysis of the Hotel Occupancy Tax Act in light of the
foregoing principles makes it clear that the State is a "person"
required to collect the tax. In line with the reasoning in the
Coumantaros case, the State Parks Board is, in effect, given
a right or remedy (i.e., collection of the tax from the
occupant) in reference to an activity "such as other persons,
natural or artificial, are accustomed to conduct."[1] This
position is also fortified by reference to another extrinsic
aid to statutory interpretation, i.e., "past judicial expression."
(See discussion of Georgia v. Evans, supra.)

---

[1]
Though the renting of cabins in this case may, perhaps, be a
non-profit activity, or designed to foster the esthetic, it
nevertheless is an enterprise that is commercial in nature.

It is specifically noted that by the statute in question the tax is not imposed on the State itself, rather instead the State merely collects the tax from those occupying the sleeping accomodations. Your first question is answered in the affirmative.

Conditioned upon an affirmative answer to the first question, you ask:

> "Does the tax apply to a room or cabin where the cost of occupancy for one person is less than two dollars ($2.00) per day, but for two or more persons is more than two dollars ($2.00) per day?"

The tax is imposed upon the total cost of occupancy of a rental unit, or "space", regardless of the number of people who pay for or take advantage of the privilege of occupancy. Consequently, where more than two dollars ($2.00) per day is charged for the same rental unit, the tax is due.

You next ask whether the tax applies "where group camp facilities (consisting of dormitory buildings, service buildings and showers, clothes washing equipment and sanitary facilities, combination dining hall and kitchen, recreation hall and administrative staff cottage) are rented to a group (that is not exempt under paragraph (c) of Art. 23.02 of said H.B. 11) at a charge of $35.00 a day for 50 persons."

Under the facts presented, it must be considered that the entire "group camp facility" is the rental unit furnished, since there is no indication that the rental price is divided according to the number of "rooms" or "spaces"; nor does there appear to be any separation of the charge for the buildings used for sleeping accomodations from charges made for service "buildings" or "dining" or "recreation" halls. Therefore, it appears that the tax is due upon the entire cost of occupancy. (On this point, attention is directed to Opinion No. WW-706, cited supra, and in particular to Questions and Answers Nos. 1, 2 and 5 therein).

The last question is whether the tax is to be collected on screened-in camping shelters where nothing is furnished, "not even a bed."

As pointed out above, a "hotel" is a building in which the public may for a consideration, obtain "sleeping accomodations". The term "sleeping accomodations" infers something more than a mere overhead covering; it appears that some sort of bed, cot, bunk, hammock, mattress, or at least a pallet, is required.

A person who receives none of these articles (or a sub-specie thereof) is not very well "accomodated" for sleeping. Therefore, this question is answered in the negative.

### S U M M A R Y

The Hotel Occupancy Tax is due on the cost of occupancy of rooms, cabins, camping shelters, and "group camping units" owned by the Texas State Parks Board where the price charged for such occupancy exceeds two dollars ($2.00) per day per individual rental unit. However, the tax is not due on screened-in camping shelters where nothing is furnished, "not even a bed."

Yours very truly,

WILL WILSON
Attorney General of Texas

By Jack N. Price
Assistant

JNP:cm

APPROVED:

OPINION COMMITTEE:
W. V. Geppert, Chairman

Richard Wells
Robert A. Rowland
Ray Loftin
Charles Cabaniss

REVIEWED FOR THE ATTORNEY GENERAL
By: Leonard Passmore



# Hyatt v. Court

 Positive

# Hyatt v. Court

Court of Appeals of Kentucky

August 28, 2009, Rendered

NO. 2008-CA-001474-MR

**Reporter**
2009 Ky. App. Unpub. LEXIS 738; 2009 WL 2633659

SCOTT HYATT; SUSAN HYATT, APPELLANTS v. IVA COURT, APPELLEE

**Notice:** THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

**Prior History:** [*1] APPEAL FROM MARSHALL CIRCUIT COURT. HONORABLE DENNIS R. FOUST, JUDGE. ACTION NO. 07-CI-00002.

**Counsel:** BRIEF FOR APPELLANTS: Dennis L. Null, Jr., Mayfield, Kentucky.

BRIEF FOR APPELLEE: G. Eric Long, Benton, Kentucky.

**Judges:** BEFORE: KELLER, STUMBO, AND VANMETER, JUDGES. ALL CONCUR.

**Opinion by:** KELLER

# Opinion

AFFIRMING

KELLER, JUDGE: This is an appeal from an order of the Marshall Circuit Court which enjoined the appellants, Scott and Susan Hyatt, (hereinafter the Hyatts), from renting their vacation home, located on Kentucky Lake. The court found that the Hyatts were in violation of a restrictive covenant contained in the deed prohibiting commercial or manufacturing activity. In the appeal, the Hyatts argue they have not violated the restrictive covenant as the rental of their vacation home does not rise to the level of a commercial purpose. Alternatively, the Hyatts assert that even if their behavior violates the deed, the character of the subdivision has so changed that to do equity, the restriction should be nullified. We disagree with the Hyatt's contentions, and therefore affirm the Marshall Circuit Court's judgment due to the reasons set forth below.

FACTS

A bench trial was held in June of 2008. As the parties do not dispute [*2] the facts found by the court, we will reiterate those facts which are pertinent below. In the trial court, the appellant, Iva Court, and ten others [1] (hereinafter the owners), owned homes located in the Sherwood Shores Subdivision. Citing various complaints against renters of the Hyatt's home, including blocking access to driveways, trash, and vulgar language, the owners sought to enforce a restrictive covenant found in their collective deeds. The relevant portions of the restrictions are set out as follows:

> 1. No building shall be erected or maintained on any lot in Sherwood Shores other than a

---

[1] Due to the appellee's failure to name the additional parties in the notice of appeal, the additional persons associated with the case in the trial court are not per se parties to this appeal, however, we shall refer to them in the plural so as to avoid confusion.

private residence and a private garage for the sole use of the owner or occupant, except those lots designated as commercial on the plat.

2. No part of said premises shall be used for commercial or manufacturing purposes, except those lots designated as commercial on the plat map.

The court found that the Hyatts had created a copyrighted [*3] website at www.bestkylakevacation.com advertising the rental of their fully-furnished home for up to three (3) couples or two (2) families. The rental included the use of their home and private dock for periods of two (2) nights up to one (1) week. The Hyatt's charged a security deposit, a cleaning fee, an additional amount for pets, and included a charge of 10% Kentucky sales tax. Tenants entered into a written rental agreement, which included a specific check-in and check-out time, a $ 300.00 damage deposit, and a $ 10.00 per person charge for each additional person over the age of ten (10). The Hyatts provided linens, paper products, and other amenities for which there were other fees. The form specifically designated that the "rental is for vacation purposes only."

In addition to producing a witness who testified that he also advertised his Sherwood Shores property for rent, the Hyatts testified that there were five (5) to six (6) other properties, possibly in Sherwood Shores, that they believed likewise rented on substantially the same basis as their own. The court found that the Hyatt's tax returns for 2006 and 2007 listed the rents paid as income, and deducted as expenses the [*4] cleaning, maintenance, repairs, supplies, utilities, insurance, legal and professional fees, as well as depreciation of the property. Additionally, the Hyatts paid the required Marshall County tourist and convention commission monthly transient room tax, and the Kentucky sales use and transient room tax, as is required of motels, hotels, and persons renting their property.

When analyzing the restrictive covenant, the court found that the phrase "commercial or manufacturing purposes" was not ambiguous and therefore there was no need to scrutinize it further. The court stated, "[r]enting or leasing a home on a daily or weekly basis, paying business taxes, and depreciating the asset for income tax purposes are all characteristics of a 'commercial purpose.' The court further found that the fact that other residents may be renting their property in the same way that the Hyatts were, did not make the phrase ambiguous.

Lastly, the court found that the subdivision's character had not changed sufficiently to warrant waiver of the restrictive covenant pursuant to Kentucky law. Therefore, the court enjoined the Hyatts from continuing to rent their property in violation of the restrictions.

As stated [*5] above, the Hyatts argue to this Court that their behavior in renting their property does not constitute commercial activity, but that even if it did, the restriction should not be enforced as there has been a change in the character of the neighborhood such that it is no longer possible to accomplish the purpose intended by the covenant.

STANDARD OF REVIEW

We agree with both parties that interpretation of the restrictive covenant is a question of law appropriate for *de novo* review by this Court. *Colliver v. Stonewall Equestrian Estates Ass'n, Inc.*, 139 S.W.3d 521, 522-23 (Ky. App. 2004). Furthermore, as the parties agree that there are no factual disputes, we will concentrate our evaluation as to whether the Hyatts were entitled to a judgment in their favor as a matter of law.

ANALYSIS

The Hyatts urge us to look to other jurisdictions for our analysis of this matter, as they believe that there is not a Kentucky case that resolves the specific question of whether short-term rental of property is a "commercial purpose." While we believe the cases from Oregon and Virginia cited by the Hyatts are noteworthy, we do not agree that they reflect the state of the law in our Commonwealth. Therefore, [*6] we look to our precedent, where the essential rule when attempting to construe ambiguous restrictive covenants is that the party's intention governs. *See Glenmore Distilleries v. Fiorella*, 273 Ky. 549, 554, 117 S.W.2d 173, 176 (1938). If known, the surrounding circumstances of the development are likewise an important consideration when ambiguous language creates a doubt as to what the creators intended to be prohibited. *Brandon v. Price*, 314 S.W.2d 521, 523 (Ky. 1958). Thus, the construction may not be used to defeat the obvious intention of the parties though that intention be not precisely expressed. *Connor v. Clemons*, 308 Ky. 9, 213 S.W.2d 438 (1948).

Kentucky has approached restrictive covenants from the viewpoint that they are to be regarded

more as a protection to the property owner and the public rather than as a restriction on the use of property, and that the old-time doctrine of strict construction no longer applies. *Highbaugh Enterprises Inc. v. Deatrick and James Construction Co.*, 554 S.W.2d 878, 879 (Ky. App. 1977).

*Colliver v. Stonewall Equestrian Estates Ass'n, Inc.*, 139 S.W.3d 521, 523 (Ky. App. 2003).

Indeed, in 1952, our Supreme Court noted:

> [W]e are among the jurisdictions [*7] which adhere to the concept that such restrictions constitute mutual, reciprocal, equitable easements of the nature of servitudes in favor of owners of other lots of a plot of which all were once a part; that they constitute property rights which run with the land so as to entitle beneficiaries or the owners to enforce the restrictions, and if it be inequitable to have injunctive relief, to recover damages. *Crutcher v. Moffett*, 205 Ky. 444, 266 S.W. 6; *Starck v. Foley*, 209 Ky. 332, 272 S.W. 890, 41 A.L.R. 756; *Doll v. Moise*, 214 Ky. 123, 282 S.W. 763; *Bennett v. Consolidated Realty Co.*, 226 Ky. 747, 11 S.W.2d 910, 61 A.L.R. 453.

*Ashland-Boyd County City-County Health Dep't v. Riggs*, 252 S.W.2d 922, 924-25 (Ky. 1952).

In *Ashland-Boyd* the question presented was whether or not a governmental health clinic for indigents violated a restriction against the erection of a "'business house of any kind.'" The Supreme Court sought first to define business prior to holding that a health clinic is not a business:

> The term 'business' has a broad meaning and significance and may be used with many different connotations. It refers generally to a trade or occupation or to commercial, industrial and professional [*8] engagements.

*Id.* at 925-26.

In *Connor v. Clemons*, 308 Ky. 9, 213 S.W.2d 438 (1948), the construction of a church was proposed on land where the deeds prohibited a "building or structure to be used for business purposes" and provided that "[n]ot more than one structure to be used for residential purposes shall be erected on any one lot." *Id.*, 308 Ky. at 10, 213 S.W.2d at 439. Holding that the two restrictions when read together raised an ambiguity, the Supreme Court reasoned:

> When the grantor specifically prohibits the use of property for a particular purpose, the more reasonable construction would be that no other uses are prohibited. At least an intention to further extend the limitations is very doubtful. It is at this point that we must apply the rule of strict construction against a restraint on the free use of land.

*Id.*, 308 Ky. at 12, 213 S.W.2d at 440.

Only then, when faced with an ambiguity, did the Supreme Court opine that a church was not a business, and that its erection did not violate the restriction. Such is what we must do in the instant matter; that is, decide if the restriction and/or its language are ambiguous, define what is prohibited, and then decide if the actions [*9] of the Hyatts rise to the level of behavior sought to be prohibited.

The trial court found that the restriction is unambiguous and that it clearly sought to prevent any commercial or manufacturing activity within the subdivision, except where originally authorized. While we agree with the trial court on this issue, we nevertheless undertake to further define the term commercial as it is ordinarily used in legal documents. Black's Law Dictionary, 7th edition, 1999, does not define commercial, but does use the term within its definition of business:

> **Business**. A commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain.

BLACK'S LAW DICTIONARY, 7th edition, 1999.

Merriam-Webster's 2009 Online Dictionary defines commercial as of or relating to commerce, which is defined as the exchange or buying or selling of commodities on a large scale involving transportation from place to place, and is synonymous with business. There can be no doubt that the Hyatts define their rental enterprise as a business. The Hyatts cannot label the rental of their vacation home one thing to the Internal Revenue Service and characterize it to the [*10] contrary to this Court.

The Hyatts urge us to note that the people who rent their property engage in the very same recreational activities

as do the owners or their guests who reside in the dwellings within the Sherwood Shores subdivision. While this may indeed be the case, it is not what the tenants do to occupy their time while on the property that is forbidden, it is the fact that the property is being held out for remuneration in much the same manner as a hotel or motel that is restricted. The creators of the subdivision plainly intended to restrain deed-holders from engaging in anything more than recreation while using their property. Such is the privilege of the creators. That the other property owners seek to enforce the protections of the restrictive covenants is their right.

What is equally clear is that the Hyatts have gone to a great deal of trouble to treat their vacation property as a business. The rental agreement, copyrighted web-site, [2] check-in and check-out times, and the supply of various sundries to tenants, underscore the appropriateness of this commercial classification. Further, the fact that the Hyatts are required to pay the same taxes as is required of motels [*11] and hotels only emphasizes the business-related nature of their endeavor. It is unmistakable that the Hyatts have violated the restrictive covenant as the trial court found.

Our analysis cannot stop here however; as the Hyatts have alleged that the neighborhood's character has so changed that to enforce the covenants as written would violate equity. Kentucky case law simply does not support their argument. Before enforcement is prevented in equity, change in the character of a neighborhood intended to be created by restrictions must be so drastic as to render the original purpose or intent impossible:

> The fact and circumstances must be examined to determine whether the change of the character of the neighborhood is sufficient to vitiate the restrictions; or, to state the question in other terms, whether the 'scheme of development' contemplated by the restrictions has been abandoned sufficiently to operate ipso facto as a vitiation of the restrictions.

*Logan v. Logan*, 409 S.W.2d 531, 534 (Ky. 1966); *see also Goodwin Bros. v. Combs Lumber Co.*, 275 Ky. 114, 120 S.W.2d 1024 (1938).

Despite [*12] the other witnesses for the Hyatts, who testified that they are also engaged in renting property in Sherwood Shores, the trial court did not find evidence of such an abandonment of purpose as to render the restrictions obsolete. We discern no abuse of discretion in this finding. The neighborhood has not abandoned the original intention of a purely residential area, which is evident by simply counting the parties involved on either side of this lawsuit.

For the foregoing reasons, we affirm the Marshall Circuit Court's judgment enjoining the appellant's from any further commercial activity, including the rental of their home.

ALL CONCUR.

---

2 Presumably the Hyatts are attempting to prevent competition from other businesses by the use of copyright laws.

# AP-102



# Texas Questionnaire for Hotel Occupancy Tax

**GLENN HEGAR**   TEXAS COMPTROLLER OF PUBLIC ACCOUNTS

## GENERAL INSTRUCTIONS

**WHO MUST SUBMIT THIS QUESTIONNAIRE –** You must submit this questionnaire if you are an individual, partnership, corporation or organization operating a hotel in Texas.

**DEFINITIONS –**
- HOTEL: A hotel is a building in which members of the public obtain sleeping accommodations for consideration. Examples include hotels, motels, bed and breakfasts, rooming houses, skid mounted bunkhouses, tourist houses, tourist courts, manufactured homes, residency inns, condominiums, cabins and cottages.
- BUSINESS LOCATION: Any location where you provide sleeping accommodations for consideration.

*NOTE: If you have been in operation and have not submitted a questionnaire, you will need to file reports and pay tax, plus applicable penalty and interest for the period of time you have been in business.*

**FOR ASSISTANCE –** If you have any questions about this questionnaire, contact your nearest Texas State Comptroller's field office or call 1-800-252-1385.

**AMERICANS WITH DISABILITIES ACT –** In compliance with the Americans with Disabilities Act, this document may be requested in alternative formats by calling 1-800-252-5555. Hearing impaired taxpayers may call via 1-800-RELAY-TX.

**FEDERAL PRIVACY ACT** - Disclosure of your social security number is required and authorized under law, for the purpose of tax administration and identification of any individual affected by applicable law. 42 U.S.C. §405(c)(2)(C)(i); Tex. Govt. Code §§403.011 and 403.078. Release of information on this form in response to a public information request will be governed by the Public Information Act, Chapter 552, Government Code, and applicable federal law.

If you are hiring one or more employees, please contact the Texas Workforce Commission (TWC) at 512-463-2699 or your local TWC tax office to determine if you are liable for payroll taxes under the Texas Unemployment Compensation Act.

Complete this application and mail it to   COMPTROLLER OF PUBLIC ACCOUNTS
111 E. 17th Street
Austin, TX  78774-0100

Under Ch. 559, Government Code, you are entitled to review, request and correct information we have on file about you, with limited exceptions in accordance with Ch. 552, Government Code. To request information for review or to request error correction, contact us at the address or number listed on this form.

AP-102-1 (Rev.1-15/20)

 
Below is a listing of taxes and fees collected by the Comptroller of Public Accounts. If you are responsible for reporting or paying one of the listed taxes or fees, and you **DO NOT HAVE A PERMIT OR AN ACCOUNT WITH US FOR THIS PURPOSE**, please obtain the proper application by calling 1-800-252-5555 or by visiting your local Comptroller Enforcement field office.

## TAX TYPE(S)

**9-1-1 Emergency Service Fee/Equalization Surcharge -** If you are a telecommunications utility, a mobile service provider or a business service user that provides local exchange access, equivalent local exchange access, wireless telecommunications connections or intrastate long-distance service, and you are responsible for collecting emergency communications charges and/or surcharges, you must complete *Form AP-201*.

**Automotive Oil Sales Fee -** If you manufacture and sell automotive oil in Texas; or you import or cause automotive oil to be imported into Texas for sale, use or consumption; or you sell more than 25,000 gallons of automotive oil annually and you own a warehouse or distribution center located in Texas, you must complete *Form AP-161*.

**Battery Sales Fee -** If you sell or offer to sell new or used lead acid batteries, you must complete *Form AP-160*.

**Cement Production Tax -** If you manufacture or produce cement in Texas, or you import cement into Texas and you distribute or sell cement in intrastate commerce or use the cement in Texas, you must complete *Form AP-171*.

**Cigarette, Cigar and/or Tobacco Products Tax -** If you wholesale, distribute, store or make retail sales of cigarettes, cigars and/or tobacco products, you must complete *Form AP-175 or Form AP-193*.

**Coastal Protection Fee -** If you transfer crude oil and condensate from or to vessels at a marine terminal located in Texas, you must complete *Form AP-159*.

**Coin-Operated Machine Tax -** If you engage in any business dealing with coin-operated amusement machines OR engage in business to own or operate coin-operated amusement machines exclusively on premises occupied by and in connection with the business, you must complete *Form AP-146 or Form AP-147*.

**Crude Oil and Natural Gas Production Taxes -** If you produce and/or purchase crude oil and/or natural gas, you must complete *Form AP-134*.

**Direct Payment Permit -** If you annually purchase at least $800,000 worth of taxable items for your own use and not for resale, you must complete *Form AP-101* to qualify for the permit.

**Fireworks Tax -** If you collect tax on the retail sale of fireworks, you must complete *Form AP-201*. This is in addition to the sales tax permit. You are required to charge both the sales tax and the fireworks tax.

**Franchise Tax -** If you are a general partnership or non-Texas entity without a certificate of authority or certificate of registration, you must complete *Form AP-114*.

**Fuels Tax -** If you are required to be licensed under Texas Fuels Tax Law for the type and class permit required, you must complete *Form AP-133*.

**Gross Receipts Tax -** If you provide certain services on oil and gas wells OR are a utility company located in an incorporated city or town having a population of more than 1,000 according to the most recent federal census and intend to do business in Texas, you must complete *Form AP-110*.

**Off-Road, Heavy Duty Diesel Powered Equipment Surcharge** - If you sell, lease or rent off-road, heavy duty diesel powered equipment, you must complete *Form AP-201*. This is in addition to the sales tax permit. You are required to charge both the sales tax and the surcharge.

**Hotel Occupancy Tax -** If you provide sleeping accommodations to the public for a cost of $15 or more per day, you must complete *Form AP-102*.

**International Fuel Tax Agreement (IFTA) -** If you operate qualified motor vehicles that require you to be licensed under the International Fuel Tax Agreement, you must complete *Form AP-178*.

**Manufactured Housing Sales Tax -** If you are a manufacturer of manufactured homes or industrialized housing engaged in business in Texas, you must complete *Form AP-118*.

**Maquiladora Export Permit -** If you are a maquiladora enterprise and wish to make tax-free purchases in Texas for export to Mexico, you must complete *Form AP-153,* to receive the permit.

**Motor Vehicle Seller-Financed Sales Tax -** If you finance sales of motor vehicles and collect Motor Vehicle Sales Tax in periodic payments, you must complete *Form AP-169*.

**Motor Vehicle Gross Rental Tax -** If you rent motor vehicles in Texas, you must complete *Form AP-143*.

**Petroleum Products Delivery Fee -** If you are required to be licensed under Texas Water Code, sec. 26.3574, you must complete *Form AP-154*.

**Sales and Use Tax -** If you engage in business in Texas; AND you sell or lease tangible personal property or provide taxable services in Texas to customers in Texas; and/or you acquire tangible personal property or taxable services from out-of-state suppliers that do not hold a Texas Sales or Use Tax permit, you must complete *Form AP-201*.

**Sulphur Production Tax -** If you own, control, manage, lease or operate a sulphur mine, well or shaft, or produce sulphur by any method, system or manner, you must complete *Form AP-171*.

**Texas Customs Broker License -** If you have been licensed by the United States Customs Service AND want to issue export certifications, you must complete *Form AP-168*.



AP-102-3 (Rev.1-15/20)

# Texas Questionnaire for Hotel Occupancy Tax

• *TYPE OR PRINT*    • *Do NOT write in shaded areas.*

## SOLE OWNER IDENTIFICATION

1. Name of sole owner *(First, middle initial and last name)*

2. Social Security Number (SSN)  ☐ Check here if you DO NOT have a SSN.

3. Taxpayer number for reporting any Texas tax OR Texas identification number if you now have or have ever had one.

## NON-SOLE OWNER IDENTIFICATION

### --- ALL SOLE OWNERS SKIP TO ITEM 9. ---

4. Business Organization Type

☐ Profit Corporation (CT, CF)
☐ Nonprofit Corporation (CN, CM)
☐ Limited Liability Company (CL, CI)
☐ Limited Partnership (PL, PF)
☐ Professional Corporation (CP, CU)
☐ Other *(explain)*

☐ General Partnership (PB, PI)
☐ Professional Association (AP, AF)
☐ Business Association (AB, AC)
☐ Joint Venture (PV, PW)
☐ Holding Company (HF)

☐ Business Trust (TF)
☐ Trust (TR) Please submit a copy of the trust agreement with this application.
☐ Real Estate Investment Trust (TH, TI)
☐ Joint Stock Company (ST, SF)
☐ Estate (ES)

5. Legal name of corporation, partnership, limited liability company, association or other legal entity

6. Taxpayer number for reporting any Texas tax OR Texas identification number if you now have or have ever had one. .....

7. Federal Employer Identification Number (FEIN) assigned by the Internal Revenue Service ..................................... 1

8. ☐ Check here if you do not have an FEIN. ......................................................................................... 3

## BUSINESS INFORMATION

9. Mailing address
Street number, P.O. Box, or rural route and box number

City    State/province    ZIP code    County *(or country, if outside the U.S.)*

10. Name of person to contact regarding day to day business operations    Daytime phone

11. Principal type of business

☐ Agriculture    ☐ Transportation    ☐ Retail Trade    ☐ Real Estate    ☐ Mining    ☐ Communications
☐ Finance    ☐ Services    ☐ Construction    ☐ Utilities    ☐ Insurance    ☐ Public Administration
☐ Manufacturing    ☐ Wholesale Trade    ☐ Other *(explain)*

12. Primary business activities and type of products or services to be sold    NAICS

## TAXPAYER INFORMATION

### If you are a SOLE OWNER, skip to Item 18.

13. If the business is a Texas profit corporation, nonprofit corporation, professional corporation or limited liability company, enter the file number issued by the Texas Secretary of State and date....
File number    Month   Day   Year

14. If the business is a non-Texas profit corporation, nonprofit corporation, professional corporation or limited liability company, enter the state or country of incorporation, charter number and date, and if the corporation has a Texas Certificate of Authority, enter the file number and date.
State/country of inc.    Charter number    Month   Day   Year    Texas Certificate of Authority number    Month   Day   Year

15. If the business is a corporation, has the business been involved in a merger within the last seven years? ..... ☐ YES  ☐ NO    *If "YES," attach a detailed explanation.*

16. If the business is a limited partnership or registered limited liability partnership, enter the home state and registered identification number. ............................................    State    Number

17. List general partners, principal members/officers, managing directors or managers *(Attach additional sheets, if necessary.)*
Name    Title    Phone *(Area code and number)*

Home address    City    State    ZIP code

SSN or FEIN    County *(or country, if outside the U.S.)*    Percent of ownership ____ %

Position held    ☐ Partner    ☐ Officer    ☐ Director    ☐ Corporate Stockholder    ☐ Record keeper

Name    Title    Phone *(Area code and number)*

Home address    City    State    ZIP code

SSN or FEIN    County *(or country, if outside the U.S.)*    Percent of ownership ____ %

Position held    ☐ Partner    ☐ Officer    ☐ Director    ☐ Corporate Stockholder    ☐ Record keeper


# Texas Questionnaire for Hotel Occupancy Tax

**• TYPE OR PRINT**          **• Do NOT write in shaded areas.**

18. Legal name of entity *(Same as Item 1 OR Item 5)*

**BUSINESS LOCATION**

19. Business location name and address *(Attach additional sheets for each additional location.)*

Business location name

Street and number *(Do not use P.O. Box or rural route.)* | City | State | ZIP code | County

Physical location *(If business location address is a rural route and box number, provide directions – e.g., "2 miles west of Austin on FM 2222.")*          Business location phone

20. Is your business located inside the city limits? ............................................... ☐ YES   ☐ NO

21. Brief description of your business activities for this location.

22. Enter the date of the first business operation in the above location that is subject to hotel occupancy tax, or the date you plan to start such business operation *(Date cannot be more than 90 days in the future.)* ......................

23. Enter the number of rentable rooms ....................................................................................

24. Do you own or rent/lease property at this location?..................................................... ☐ OWN   ☐ RENT/LEASE

If you rent or lease the real property, enter the property owner's name and address.

Property owner's name

Property owner's address

**PREVIOUS OWNER INFORMATION**

*If you purchased an existing business or business assets, complete Items 25-28.*

25. Previous owner's trade name.          Previous owner's taxpayer number, if available

26. Previous owner's legal name, address, and phone number, if available.

Name          Phone *(Area code and number)*

Address *(Street and number)* | City | State | ZIP code

27. Check each of the following items you purchased.

☐ Inventory   ☐ Corporate stock   ☐ Equipment   ☐ Real estate   ☐ Other assets

28. Purchase price of this business or assets and the date of purchase.

Purchase price  $          *Month  Day  Year*
Date of purchase

**SIGNATURES**

29. The sole owner, all general partners, corporation or organization president, vice-president, secretary or treasurer, managing director, or an authorized representative must sign. A representative must submit a written power of attorney. *(Attach additional sheets if necessary.)*

Date of signature(s)
*Month  Day  Year*

I (We) declare that the information in this document and any attachments is true and correct to the best of my (our) knowledge and belief.

Type or print name and title of sole owner, partner, or officer | Driver license number/state | **sign here ▶** Sole owner, partner, or officer

Type or print name and title of partner or officer | Driver license number/state | **sign here ▶** Partner or officer

Type or print name and title of partner or officer | Driver license number/state | **sign here ▶** Partner or officer

**FOR COMPTROLLER USE ONLY**          USERID _____          Date _____